UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WELLS FARGO BANK,

      Plaintiff,

v.

      CASE NO. 12-CV-12308
      HONORABLE GEORGE CARAM STEEH

TROLLEY INDUSTRIAL, L.L.C.,
LAREY DRESNER, ROBERT
DRESNER, and MARK LEWIS

      Defendants.

_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (Doc. 55) AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 54)**

This lawsuit arises out of a $5.4 million commercial loan for certain real property and

light industrial buildings in the City of Taylor, Michigan which sit on a landfill from the 1950s

and 1960s.  Plaintiff Wells Fargo Bank ("Wells Fargo"), the successor in interest to the

original lender, brought a complaint against defendant borrower Trolley Industrial, LLC,

("Trolley") and its principals, Larey Dresner, Robert Dresner, and Mark Lewis, (collectively

"Defendants") alleging, inter alia, that Defendants defaulted on the loan when it became

due, and seeking the appointment of a receiver and foreclosure of the property.  A Receiver

has been appointed, and the parties have settled all of the claims of the lawsuit except for

Count IV of the First Amended Complaint, which alleges that Defendants are liable for the

cost of the alleged diminution in value of the property due to the release of methane gas,

under the parties' Hazardous Substances Indemnity Agreements ("Indemnity

-1-

Agreements"). Both sides have filed motions for summary judgment. Oral argument was heard on August 19, 2013. For the reasons set forth below, the parties' cross-motions for summary judgment shall be denied.

<u>BACKGROUND</u>

On September 11, 2001, Trolley received a $5.4 million commercial mortgage loan from Column Financial, Inc. ("Column") secured by real property located at 21100-21150 Trolley Industrial Drive ("Property"). It was a non-recourse loan meaning that in the event that Trolley defaulted, the lender could seize the property, but Trolley had no personal liability for the loan, even if the Property did not cover the full value of the defaulted amount. The Loan was secured by several documents including the Promissory Note and the Mortgage which were executed by Trolley and Column. (Doc. 54 at A-B). In addition, on the same date that the Promissory Note was executed, Trolley and the three individual Defendants executed three identical Indemnity Agreements promising that the Defendants would have certain obligations with respect to hazardous wastes on, in, under, or affecting the Property. <u>Id.</u> at C, D, E. Wells Fargo alleges that because the Property was located on top of a landfill, and the parties anticipated that environmental issues could arise in the future, Defendants assumed the risk of costs caused by environmentally hazardous substances by executing the Indemnity Agreements. (Doc. 54 at 2). Defendants vigorously dispute this assertion. Column assigned the loan to Wells Fargo in approximately 2002.

Prior to the execution of the mortgage, Enviro Business, Inc. conducted an investigation and reported its findings in a Phase I Environmental Site Assessment Report ("Environmental Report") dated June 19, 2001. (Doc. 55, Ex. 3). The Environmental

Report disclosed that the Property was the site of an unregulated landfill, but did not discuss whether methane gas was located on the property. Id. at 11-12, 17.  Sometime in 2010, the floors at the 21146 building shifted by seven to twenty-three inches, leading to an investigation that revealed the presence of methane gas at a potentially explosive level. (Doc. 54, Ex. I).  On November 1, 2010, Applied Geotechnical Services, Inc. ("AGS") prepared an environmental report for Defendant Lewis ("2010 Environmental Report"), disclosing high levels of methane gas on the property and recommending remedial measures including the installation of a sub-slab depressurization system ("SSD") to vacuum the methane gas from the sub-surface and vent it above the buildings, as well as other techniques to address the situation. Id. at 5-7.  On December 17, 2010, Trolley sent a letter to Column advising it of the existence and release of the methane gas.  On May 5, 2012, Wells Fargo filed this lawsuit solely against Trolley seeking recovery under the Note, foreclosure of the Property, claim and delivery, and appointment of a receiver.  On June 14, 2012, the court appointed a Receiver for the property.  On July 12, 2012, Wells Fargo amended the complaint to add the Trolley principals as Defendants and to add a claim alleging that Defendants were liable for the release of methane gas on the Property under the Indemnity Agreements.  On May 16, 2013, pursuant to a settlement agreement among the parties, this court entered an order of partial dismissal, as to all claims other than those premised on the Indemnity Agreements.

　　　Wells Fargo states that during the transition of the Property to the Receiver, it received a copy of the 2010 Environmental Report, and thereafter procured its own expert, William Liebe, of Advantage Environmental Consultants ("AEC"), who confirmed high levels of methane gas on the property.  (Doc. 54, Ex. F, J).  Wells Fargo's expert noted some

-3-

settling in the concrete floor slab in one of the buildings, which he estimated would cost approximately $150,000 to $200,000 to repair.   (Doc. 54, Ex. J at 3).   Like the recommendations of the 2010 Environmental Report, AEC recommended the installation of an SSD and further investigation.   Id. at 3.   In support of its motion for summary judgment, Wells Fargo relies on a May 17, 2013 appraisal of the property performed by Ilya Barskiy, who opines that the value of the property has diminished by at least the amount of environmental remediation costs. (Doc. 54, Ex. G at ¶¶ 9-10).  In response, Defendant's rely on their environmental expert, Jeffrey Anagnostou, of AGS, who concludes that the methane gas existing at the property is the result of historic landfilling activities conducted at the site in the 1950s and possibly the 1960s, and thus, the value of the property could not possibly be diminished based on that same environmental condition.  (Doc. 60, Ex. 6, ¶¶ 5-10).  Wells Fargo does not dispute that methane gas is the natural byproduct of a decomposing landfill, but argues that the methane gas levels in 2001 were benign.  In addition, Wells Fargo has filed a motion to strike Anagnostou's affidavit under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), on the grounds, inter alia, that Anagnostou is not an expert in the valuation of commercial real estate.  In a separate order entered this same date, this court has denied Wells Fargo's motion to strike and has considered Anagnostou's testimony.  Having duly considered Anagnostou's affidavit, this court reaches the conclusion that § 1 of the Indemnity Agreements requires that Defendants are personally liable for any diminution in value of the Property caused by the presence of methane gas, but if and only if, Wells Fargo can prove an actual diminution in the value of the Property.  For the reasons discussed later in this opinion, a triable issue

of fact remains as to whether there has been a diminution in the value of the Property at all.

Count IV of the First Amended Complaint alleges that Defendants are liable for the release of certain hazardous substances on the property, which they allege constitute recoverable "costs" under the Indemnity Agreements.  In its motion for summary judgment, Wells Fargo argues that the release of methane gas at the Property has caused a diminution in value of the Property which they claim they can recover from Defendants under the three identical Indemnity Agreements  executed by the three Trolley principals. (Doc. 54, Ex. C, D, E).[1] Defendants, in their own motion for summary judgment and in their response, contend that the Indemnity Agreements are only implicated when there is a "claim, litigation or proceeding" where liability is imposed on the lender.

The parties agree that the following provision of the Indemnity Agreements is the crux of their dispute, and each side claims that an unambiguous reading of this contractual provision requires that the court grant summary judgment in their favor:

> 1.   <u>INDEMNITY.</u>    INDEMNITORS COVENANT AND AGREE, AT INDEMNITORS' SOLE COST AND EXPENSE, TO INDEMNIFY, DEFEND (AT TRIAL AND APPELLATE LEVELS, AND WITH ATTORNEYS, CONSULTANTS AND EXPERTS ACCEPTABLE TO LENDER), AND HOLD LENDER HARMLESS FROM AND AGAINST ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS', CONSULTANTS' AND

---

[1]Wells Fargo states that it is prohibited from remediating hazardous substances itself and requesting reimbursement from Defendants under the terms of a Pooling and Serving Agreement (Doc. 54, Ex. K at § 3.09(c)).  Thus, Wells Fargo seeks to recover the alleged diminution in value of the Property and to sell it as-is.

EXPERTS' FEES AND DISBURSEMENTS **ACTUALLY INCURRED IN INVESTIGATING, DEFENDING, SETTLING OR PROSECUTING ANY CLAIM, LITIGATION OR PROCEEDING**) **(COLLECTIVELY "COSTS")** WHICH MAY AT ANY TIME BE **IMPOSED UPON, INCURRED BY OR ASSERTED OR AWARDED AGAINST LENDER OR THE PROPERTY**, AND ARISING DIRECTLY OR INDIRECTLY FROM OR OUT OF: **(I) THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES (AS DEFINED IN THE SECURITY INSTRUMENT) ON, IN, UNDER, AFFECTING OR THREATENING TO AFFECT ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS, REGARDLESS OF WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF INDEMNITORS**; (II) THE VIOLATION OF ANY ENVIRONMENTAL LAWS (AS DEFINED IN THE SECURITY AGREEMENT) RELATING TO, AFFECTING OR THREATENING TO AFFECT THE PROPERTY, WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF INDEMNITORS; (III) THE FAILURE OF INDEMNITORS TO COMPLY FULLY WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT; (IV) THE BREACH OF ANY REPRESENTATIONS OR WARRANTY CONTAINED IN THIS AGREEMENT; **OR** (V) THE ENFORCEMENT OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE COST OF ASSESSMENT, CONTAINMENT AND/OR REMOVAL OF ANY AND ALL HAZARDOUS SUBSTANCES ON AND/OR FROM ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS, THE COST OF ANY ACTIONS TAKEN IN RESPONSE TO THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES ON, IN, UNDER OR AFFECTING ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS TO PREVENT OR MINIMIZE SUCH RELEASE OR THREAT OF RELEASE SO THAT IT DOES NOT MIGRATE OR OTHERWISE CAUSE OR THREATEN DANGER TO PRESENT OR FUTURE PUBLIC HEALTH, SAFETY, WELFARE OR THE ENVIRONMENT, AND COSTS INCURRED TO COMPLY WITH THE ENVIRONMENTAL LAWS IN CONNECTION WITH ALL OR ANY PORTION OF THE PROPERTY OF ANY SURROUNDING AREAS. **"COSTS" AS USED IN THIS AGREEMENT SHALL ALSO INCLUDE ANY DIMINUTION IN THE VALUE OF THE SECURITY AFFORDED BY THE PROPERTY OR ANY FUTURE REDUCTION IN THE SALES PRICE OF THE PROPERTY BY REASON OF ANY MATTER SET FORTH IN THIS SECTION 1,** AND ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS OR EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER ARISING OUT OF OR RELATING TO INJURY OR DEATH DUE TO EXPOSURE FROM

> HAZARDOUS SUBSTANCES THAT MAY BE PRESENT OR RELEASED AT, ON, UNDER OR FROM THE PROPERTY. **LENDER'S RIGHTS UNDER THIS SECTION SHALL SURVIVE PAYMENT IN FULL OF THE INDEBTEDNESS SECURED BY THE SECURITY INSTRUMENT AND SHALL BE IN ADDITION TO ALL OTHER RIGHTS OF LENDER UNDER THIS AGREEMENT, THE SECURITY INSTRUMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS.** THE FOREGOING INDEMNITY SHALL SPECIFICALLY NOT INCLUDE ANY SUCH COSTS RELATING TO HAZARDOUS SUBSTANCES WHICH ARE INITIALLY PLACED ON, IN OR UNDER THE PROPERTY AFTER FORECLOSURE OR OTHER TAKING OF TITLE TO THE PROPERTY BY LENDER.

(Doc. 54, Ex. C, D, E at § 1) (emphasis added).  Defendants do not discuss the language, "COSTS" AS USED IN THIS AGREEMENT SHALL ALSO INCLUDE ANY DIMINUTION IN THE VALUE OF THE SECURITY AFFORDED BY THE PROPERTY OR ANY FUTURE REDUCTION IN THE SALES PRICE OF THE PROPERTY BY REASON OF ANY MATTER SET FORTH IN THIS SECTION 1," in their briefs.  Defendants further argue that § 1 provides for indemnity only when an actual claim, litigation, or proceeding occurs.  Wells Fargo, however, responds that Defendants' duty to indemnify arises in twenty-one circumstances: (1) liens, (2) damages, (3) losses, (4) liabilities, (5) obligations, (6) settlement payments, (7) penalties, (8) assessments, (9) citations, (10) directives, (11) claims, (12) litigations, (13) demands, (14) defenses, (15) judgments, (16) suits, (17) proceedings, (18) costs, (19) disbursements, (20) expenses of any kind or of any nature whatsoever, and (21) "'costs' as used in this Agreement shall also include any diminution in the value of the security afforded by the Property or any future reduction in the sales price of the Property by reason of any matter set forth in this Section 1."  Id. Defendants claim their duty to indemnify does not arise unless there is a third-party claim based upon

-7-

§ 4(a) of the Indemnity Agreements, which sets forth the procedures that the lender must follow to notify the indemnitor of the filing of any action against the lender:

> If any action shall be brought against Lender based on any of the matters for which Lender is indemnified hereunder, Lender shall notify Indemnitors in writing thereof and Indemnitors shall promptly assume the defense thereof, including, without limitation, the employment of counsel acceptable to Lender . . .

Id. at § 4. Wells Fargo, on the other hand, argues that the Indemnity Agreements require Defendants to cover any alleged loss in property value caused by the presence of methane gas because the term "costs" is broadly drafted to cover diminished property value regardless of whether any actual claim is brought against the lender.[2]

Defendants argue that the title of the document itself, "Hazardous Substances Indemnity Agreement" militates in favor of its interpretation of the agreement as only being triggered when there is an actual claim, litigation, or proceeding resulting in the imposition of liability against the lender. Wells Fargo responds that the parties agreed in the Indemnity Agreement that "[t]he captions and headings of the sections and paragraphs of this Agreement are for convenience of reference only and shall not be construed in interpreting the provisions hereof." Id. at § 7(n). Defendants argue that Wells Fargo is attempting to turn a nonrecourse loan into a full recourse loan. The Promissory Note clearly provides that Trolley would be liable for the indebtedness "to the full extent (but only to the extent) of the security therefor." (Doc. 55, Ex. 1 at § 1.5). Wells Fargo, on the other hand, argues that Defendants are personally liable for costs related to environmentally hazardous

---

[2]In the alternative, Wells Fargo asks that court defer a decision on the motions until the property is sold by the receiver at which time the amount of alleged diminution in value of the Property, if any, will be established.

substances affecting the Property based on a provision in the Indemnity Agreements which

provide:

> Fully Recourse.  All of the terms and provisions of this Agreement are recourse
> obligations of [Defendants] and not restricted by any limitation on personal liability.

(Doc. 54, Ex. C, D, E at § 7(a)).  Wells Fargo also relies on § 1.5 of the Note which

excludes liability under the Indemnity Agreements from the non-recourse provisions of the

Note:

> Nothing contained in this section [1.5 of the Note] shall . . . (3) limit or impair in any
> way whatsoever the Indemnity and Guaranty Agreement or the Hazardous
> Substances Indemnity Agreement, each of even date herewith executed and
> delivered in connection with the indebtedness evidenced by this Note or release,
> relieve, reduce, waive or impair in any way whatsoever, any obligation of the party
> to such Indemnity and Guaranty Agreement or Hazardous Substances Indemnity
> Agreement.

(Doc. 55, Ex. 1 at § 1.5).

In the Indemnity Agreements, Defendants made numerous warranties and

representations that there were no known hazardous substances or environmental

conditions on the Property, except for those environmental conditions disclosed in the

Environmental Report.  Specifically, § 2 provides:

> 2.      Representations Regarding Hazardous Substances.
> Indemnitors hereby represent and warrant to and covenant and agree with Lender,
> after due inquiry and investigation, as follows:
>
>> (a) To the best of Indemnitors' knowledge, information and belief, the
>> Property is in full compliance with all Environmental Laws;
>
>> (b) No Hazardous Substances are located on or have been handled,
>> generated, stored, processed, disposed of on or released or discharged from
>> the Property (including the soil and groundwater beneath the Property),
>> except for those substances used by Borrower in the ordinary course of its
>> business and in compliance with all Environmental Laws.

***

> (g) Except as may be disclosed in the Environmental Report (as defined in the Mortgage), there are no present environmental conditions or events or, to the best of Indemnitors' knowledge past environmental conditions or events on or near the Property that could be reasonably anticipated to materially adversely affect the value of the Property.

(Doc. 54, Ex. C, D, E at § 2).  The exception set forth in § 2(g) under Defendants' warranties, as quoted above, was not likewise included in § 1 which provides that Defendants are liable for all "costs" resulting from the presence of hazardous substances on the Property.  The loan documents warranted that there were no environmental conditions or hazardous substances on the property that would adversely affect the value of the Property except those disclosed in the Environmental Report.  Section 1.30(a) of the Mortgage provides:

> Mortgagor hereby represents and warrants to Mortgagee, after due inquiry and investigation, that, as of the date hereof: (I) the Property is in full compliance with, and to the best of Mortgagor's knowledge, information and belief, the Property has been in full compliance with, all local, state or federal laws, rules and regulations pertaining to environmental regulation, contamination, remediation or human health or safety (including the regulation or remediation of Hazardous Substances as defined below) (collectively "Environmental Laws"), all as amended; no hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including without limitation, asbestos, polychlorinated biphenyls, petroleum products, radon, lead-based paints, flammable explosives, radioactive materials, infectious substance or raw materials which may include hazardous constituents) or any other substances or material which included under or regulated by Environmental Laws (collectively, "Hazardous Substances") are located on or have been handled, manufactured, generated, stored, processed, transported to or from, or disposed of on or Released or discharged from the Property (including soil and groundwater beneath the Property), except for those substances used by Mortgagor in the ordinary course of its business and in compliance with all Environmental Laws . . . and (vii) **except as may be disclosed in that certain Phase I Environmental Site Assessment Report (the "Environmental Report") dated June 19, 2001 and prepared by Enviro Business Inc.**, a copy of which having been provided to Mortgagee, there are no present environmental conditions of events or, to Mortgagor's best knowledge past environmental conditions on or near the Property that could be reasonably anticipated to materially adversely affect the value of the Property.

-10-

(Doc. 54, Ex. B at § 1.30(a)) (emphasis added).

STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is

no genuine issue of material fact and that it is entitled to judgment as a matter of law, the

opposing party must come forward with "specific facts showing that there is a genuine issue

for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean

v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in

the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence

supporting the non-moving party.  Anderson, 477 U.S. at 248, 252.  Rather, there must be

evidence on which a jury could reasonably find for the non-movant.  McLean, 224 F.3d at

800 (citing Anderson, 477 U.S. at 252).

<u>ANALYSIS</u>

The parties have filed cross-motions for summary judgment.  Both sides argue that

the clear and unambiguous language of the Indemnity Agreements entitles them to

summary judgment.  Defendants argue that their obligation to indemnify Wells Fargo does

not arise unless there is a claim, litigation, or proceeding, and since no such action exists

here, they are entitled to summary judgment.  Wells Fargo, on the other hand, argues that

Defendants must indemnify them for the alleged diminution in the value of the Property,

which they allege is a compensable "cost" under the Indemnity Agreements.  Defendants

also argue that they are entitled to summary judgment under the theory of equitable

estoppel.

I.  <u>Principles of Contract Construction</u>

The Indemnity Agreements provide that Michigan law applies.  (Doc. 54, Ex. C, D,

E at § 7(j)).  Michigan law is clear that guaranty and indemnity agreements are construed

under Michigan's general standards of contract interpretation.  First Nat'l Bank of Ypsilanti

-12-

v. Redford Chevrolet Co., 270 Mich. 116, 121 (1935); Zurich Ins. Co. v. CCR & Co., 226 Mich. App. 599, 603 (1997). "Where parties have expressly contracted with respect to the duty to indemnify, the extent of the duty must be determined from the language of the contract." Grand Trunk Western R.R. Inc. v. Auto Warehousing Co., 262 Mich. App. 345, 353 (2004). "An express indemnity contract is construed strictly against its drafter and against the indemnitee; the indemnitor's obligation to indemnify the indemnitee must be described clearly and unambiguously." Skinner v. D-M-E Corp., 124 Mich. App. 580, 585 (1983). Where language in an indemnity agreement is clear and unambiguous, the interpretation is limited to the words used. Burkhardt v. Bailey, 260 Mich. App. 636, 656 (2004). In order for an indemnity contract to be effective, its terms must be unequivocal. Pritts v. J.I. Case Co., 108 Mich. App. 22, 29 (1981).

It is a cardinal principle of construction that a contract is to be construed as a whole; all of its parts are to be harmonized so far as reasonably possible. Laevin v. St. Vincent De Paul Society of Grand Rapids, 323 Mich. 607, 609-10 (1949). Under Michigan law, courts must "give effect to every word, phrase and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." AFSCME Int'l Union v. Bank One, 267 Mich. App. 281, 284 (2005) (citations omitted). No part of a contract is to be taken as eliminated or stricken by some other part unless such a result is fairly inescapable. Laevin, 323 Mich. at 609-10. "Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." Id. at 610 (citations omitted).

-13-

A court's obligation in interpreting a written contract is to discern the contracting parties' intent.  Quality Prod. and Concepts Co. v. Nagel Prec., Inc., 469 Mich. 362, 375 (2003) (citing Sobczak v. Kotwicki, 347 Mich. 242, 249 (1956)).  This intent is to be determined in light of the surrounding circumstances and from a reading of the instrument as a whole.  Cleveland v. Detroit Trust Co., 264 Mich. 253, 257 (1933).  If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy.  Quality Products, 469 Mich. at 375 (citing Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel, 460 Mich. 558, 570 (1999)); Port Huron Ed. Ass'n v. Port Huron Area School Dist., 452 Mich. 309, 323 (1996) (citing Dykema v. Muskegon Piston Ring Co., 348 Mich. 129, 138 (1957)).  "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided."  UAW-GM Human Resource Center v. KSL Recreation Corp., 228 Mich. App. 486, 491-492 (1998) (quoting Dillon v. DeNooyer Chevrolet Geo, 217 Mich. App. 163, 166 (1996))

II.    "Costs" Include Diminution in Value of Property under Indemnity Agreements

The Indemnity Agreements clearly provide that "'COSTS' AS USED IN THIS AGREEMENT SHALL ALSO INCLUDE ANY DIMINUTION IN THE VALUE OF THE SECURITY AFFORDED BY THE PROPERTY OR ANY FUTURE REDUCTION IN THE SALES PRICE OF THE PROPERTY BY REASON OF ANY MATTER SET FORTH IN THIS SECTION 1."  (Doc. 54, Ex. C, D, E).  Defendants' position that their duty to indemnify only arises if there is a "claim, litigation, or proceeding," while consistent with common law indemnity principles, is not born out by the express language of the Indemnity Agreements themselves.  This court is obligated to give every term of the contract meaning

-14-

and Defendants' interpretation would render the above quoted provision a nullity.  Laevin,

323 Mich. at 609-10.

Defendants argue that § 1 of the Agreement expressly provides that they are only

liable for costs that are "actually incurred in investigating, defending, settling or prosecuting

any claim, litigation, or proceeding," but Defendants have pulled the terms they cite out of

context.  Defendants' interpretation is at odds with reading § 1 as an integrated whole, as

set forth below in pertinent part:

> 1.  INDEMNITY.   INDEMNITORS COVENANT AND AGREE, AT INDEMNITORS' SOLE COST AND EXPENSE, TO INDEMNIFY, DEFEND (AT TRIAL AND APPELLATE LEVELS, AND WITH ATTORNEYS, CONSULTANTS AND EXPERTS ACCEPTABLE TO LENDER), AND HOLD LENDER HARMLESS FROM AND AGAINST ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER **(INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS', CONSULTANTS' AND EXPERTS' FEES AND DISBURSEMENTS ACTUALLY INCURRED IN INVESTIGATING, DEFENDING, SETTLING OR PROSECUTING ANY CLAIM, LITIGATION OR PROCEEDING) (COLLECTIVELY "COSTS")** WHICH MAY AT ANY TIME BE **IMPOSED UPON, INCURRED BY OR ASSERTED OR AWARDED AGAINST LENDER OR THE PROPERTY**, AND ARISING DIRECTLY OR INDIRECTLY FROM OR OUT OF: (1) THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES (AS DEFINED IN THE SECURITY INSTRUMENT) ON, IN UNDER, AFFECTING OR THREATENING TO AFFECT ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS, REGARDLESS OF WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF INDEMNITORS . . .

(Doc. 54, Ex. C, D, E at § 1) (emphasis added).  The drafters' use of parentheses quoted

above leads to the conclusion that Defendants duty to indemnify is not limited to those

situations involving third-party claims.  The terms "claim, litigation or proceeding" modify

-15-

the words "reasonable attorneys', consultants' and experts' fees and disbursements" and do not refer back to the otherwise broad list of events and circumstances giving rise to the duty to indemnify. Defendants' argument that their duty to indemnify is only triggered if there is a "claim, litigation or proceeding" is not borne out by the Indemnity Agreements themselves and would require this court to ignore the plain language of § 1 as quoted above.

Section 1 of the Indemnity Agreements provides that Defendants agree to hold Wells Fargo harmless from and against, "ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND." Id. This broad and expansive language clearly provides that the duty to indemnify is not limited only to "claim[s], litigation, and proceeding[s]." The Indemnity Agreements expressly provide that Defendants are liable for "costs" "ARISING DIRECTLY OR INDIRECTLY FORM OR OUT OF: (I) THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES (AS DEFINED IN THE SECURITY INSTRUMENT) ON, IN, UNDER, AFFECTING OR THREATENING TO AFFECT ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS, REGARDLESS OF WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF INDEMNITORS." Id.

Defendants' claim that § 4 supports its interpretation of the contract is unavailing. While § 4(a) requires that Wells Fargo give Defendants notice of any action brought against it, § 4(a) provides for indemnification procedures only when an actual third-party claim exists. Contrary to Defendants' argument, § 4 can be read in harmony with the rest of the

Indemnity Agreement such that costs could be awarded under § 1 without resort to the procedures identified in § 4(a) which are necessarily limited to those instances where a third-party claim exists.  Moreover, § 4(c) spells out indemnification procedures where no third-party claim exists, providing, "[a]ll Costs shall be immediately reimbursable to Lender when and as incurred *and*, in the event of any litigation, claim or other proceeding, without any requirement of waiting for the ultimate outcome of such litigation, claim or other proceeding."  (Doc. 54, Ex. C, D, E at § 4(c)) (emphasis added).  Based on the use of the conjunctive "and" as quoted above, it is clear that costs need not be incurred as part of "any litigation, claim or other proceeding."  Without reaching any decision as to whether or not there has been a diminution in the value of the property due to new environmental conditions, the Indemnity Agreements clearly provide that where such a diminution actually exists, Defendants have a duty to hold Wells Fargo harmless for the alleged loss.

Defendants cite to Procter & Schwartz Inc. v. U.S. Equipment Co., 624 F.2d 771 (6th Cir. 1980) and Datron v. CRA Holdings, Inc., 42 F. Supp. 2d 736, 745 (W.D. Mich. 1999) for the proposition that the duty to indemnify does not arise unless there is a third-party claim, and the party sought to be indemnified is liable for the judgment in the underlying action.  These cases fail to support Defendants' position because those cases involved principles of common law indemnity, where no contractual duty existed, and the courts found an implied contract as the basis for shifting liability to the third-party wrongdoer.  By contrast, in this case, the duty to indemnify arises from an express agreement between the parties.  Under Michigan law, the parties to a contract are free to agree to a duty to indemnify a loss which is not the subject of a legal claim or litigation.  See Smith v. Allstate Ins. Co., 102 Mich. App. 473, 475 (1980).  The drafters of a contract are no doubt the

-17-

masters of what their agreement provides and are obviously free to define contractual obligations any way they choose, regardless of labels.  In this case, the parties deviated from traditional indemnity principles and drafted the Indemnity Agreements so that the Defendants were potentially liable for a loss regardless of whether or not a legal cause of action arose.

Defendants argue that Wells Fargo's interpretation of the Indemnity Agreements also fails because it would render § 2(g) meaningless.  That provision expressly excepts representations and warranties regarding environmental conditions disclosed in the Environmental Report.  Id. at § 2(g).  Defendants argue that since the Environmental Report disclosed the presence of the unregulated landfill on the property, the existence now of methane gas caused by that condition does not constitute a hazardous substance for which Defendants could be held liable under a duty to indemnify.  Wells Fargo responds that a more complete reading of § 2 reveals that the parties to the Indemnity Agreements were unaware of any hazardous substances, such as the presence of methane gas, at the time of contracting.  Section 2 provides:

2.  <u>Representations Regarding Hazardous Substances</u>.
Indemnitors hereby represent and warrant to and covenant and agree with Lender, after due inquiry and investigation, as follows:

(a) To the best of Indemnitors' knowledge, information and belief, the Property is in full compliance with all Environmental Laws;

(b) No Hazardous Substances are located on or have been handled, generated, stored, processed, disposed of on or released or discharged from the Property (including the soil and groundwater beneath the Property), except for those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws.

*** 

-18-

> (g) Except as may be disclosed in the Environmental Report (as defined in the Mortgage), there are no present environmental conditions or events or, to the best of Indemnitors' knowledge past environmental conditions or events on or near the Property that could be reasonably anticipated to materially adversely affect the value of the Property.

(Doc. 54, Ex. C, D, E at § 2).  Although § 2(g) excepts disclosures in the Environmental Report from Defendants' warranties and representations regarding hazardous substances, § 1 does not mention the Environmental Report and thus, it does not limit liability for the presence of hazardous substances disclosed in that report.  Wells Fargo correctly maintains that if the parties had intended to exempt conditions disclosed in the Environmental Report from Defendants' duty to indemnify, they could have done so in § 1 just as they did in § 2, but they did not.  In essence, § 2 merely states that the Defendants are not aware of any environmental conditions on the Property other than that set forth in the Environmental Report.  This Section in no way limits liability for costs that may stem from conditions identified in the Report or any other unknown conditions.  Furthermore, Wells Fargo has not asserted a breach of warranty or representation claim under Subsection IV of § 1 of the Indemnity Agreements, but rather seeks recovery under Subsection I which provides for liability based on the "presence, release, or threat of release of any Hazardous Substance."  Id. at § 1.

Finally, Defendants argue that the parties' settlement agreement dated May 16, 2013, bars Wells Fargo from seeking to have the Trolley Principals guaranty the value of the Property through payment of any deficiency.  Wells Fargo, however, directs the court's attention to § 7(a) of the Indemnity Agreements which provides:

> Fully Recourse.  All of the terms and provisions of this Agreement are recourse obligations of [Defendants] and not restricted by any limitation on personal liability.

-19-

Id. at § 7(a).  Moreover, § 1.5 of the loan expressly excludes liability under the Indemnity Agreements from the non-recourse provisions of the Note:

> Nothing contained in this section [1.5 of the Note] shall . . . (3) limit or impair in any way whatsoever the Indemnity and Guaranty Agreement or the Hazardous Substances Indemnity Agreement, each of even date herewith executed and delivered in connection with the indebtedness evidenced by this Note or release, relieve, reduce, waive or impair in any way whatsoever, any obligation of any party to such Indemnity and Guaranty Agreement or Hazardous Substances Indemnity Agreement.

(Doc. 55, Ex. 1 at § 1.5).  Based on the above quoted contractual provisions, this court must reject Defendants' argument that Wells Fargo is improperly seeking to transform an alleged obligation under the Guaranty Agreement into an indemnification claim.  In sum, the court concludes that § 1 of the Indemnity Agreements requires Defendants to indemnify Wells Fargo for any diminution in the value of the property, regardless of whether the diminution was caused by an environmental condition disclosed in the Environmental Report.  Despite this conclusion, Wells Fargo is not entitled to summary judgment as issues of fact remain as to whether there has been any diminution in the value of the Property.

III.    Equitable Estoppel

Having found that the clear language of the Indemnity Agreements subjects Defendants to liability for any diminution in the value of the property caused by the presence of methane gas, the court now turns to Defendants' argument that Wells Fargo is barred from pursuing its claim based on the doctrine of equitable estoppel.  Defendants argue that the environmental conditions on the Property were expressly disclosed in the Loan Documents and thus, Wells Fargo is barred from a recovery.

"A party triggers equitable estoppel by conduct inconsistent with a position later adopted that prejudices the rights of the other party who detrimentally relied on the prior

conduct." Horton v. Ford Motor Co., 427 F.3d 382, 388 (6th Cir. 2005).  In order to prove

equitable estoppel, a party must show five prerequisites:

> (1) conduct or language amounting to a representation of material fact;
>
> (2) awareness of true facts by the party to be estopped;
>
> (3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended;
>
> (4) unawareness of the true facts by the party asserting the estoppel; and
>
> (5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

Id.  Defendants' equitable estoppel argument merely restates their theory that § 2(g)

exempts liability for costs allegedly disclosed in the Environmental Report.  Section 2(g),

however, does not involve any representations which Wells Fargo wrongfully caused

Defendants to believe, rather it involves Defendants' own representations and warranties.

Defendants have pointed to no representations by Wells Fargo, or its predecessor, Column,

that Defendants would be shielded from liability for environmental costs arising from historic

landfilling.  Section 2(g) must be read in harmony with the entire agreement and § 1 clearly

provides that Defendants are liable for all costs relating to the presence or release of "any

and all" hazardous substances.  Section 2(g) is only relevant to Subsection IV of § 1 which

provides that Defendants are liable for breaches of their own representations and

warranties.  As Wells Fargo does not seek to recover under Subsection IV, but rather under

Subsection I of § 1, § 2(g) is irrelevant, whether under a fair reading of the four corners of

the Indemnity Agreements themselves, or under the doctrine of equitable estoppel.

Finally, the court considers Defendants' argument that they cannot be liable for the presence of methane gas because the loan was a nonrecourse loan. Again, as discussed above, the Indemnity Agreements expressly provided that they were full recourse obligations for which the individual indemnitors could be subject to "personal liability." Id. at § 7(a). In addition, § 1.5 of the Promissory Note specifically provides that the Note does not "limit or impair in any way" the obligations owing under the Indemnity Agreements. (Doc. 55, Ex. 1 at § 1.5). In sum, Defendants assumed personal liability for the risk of a future diminution in the value of the Property due to the presence of environmental conditions or hazardous substances, and the doctrine of equitable estoppel cannot save defendants from that liability.

IV.     Alleged Diminution in Value of Property

Having found that under § 1 of the Indemnity Agreements, Defendants are liable for any diminution of the property value caused by the presence of methane gas, and that Defendants are not entitled to equitable estoppel, Wells Fargo is nevertheless not entitled to summary judgment as this juncture. One element triggering liability has not been established: that there has been an actual diminution in value of the Property. As compared to the conditions of the Property at the time of the loan origination, issues of fact exist as to whether the original value of the property accounted for the presence of methane as a natural byproduct of a landfill. While Wells Fargo may not be required to prove an increase in methane gas levels to prevail, so long as its presence "affects the property;" without such evidence, it may be difficult to prove to the fact-finder that there has been an actual diminution in the value of the Property. Because the issue of liability is necessarily intertwined with the issue of damages, Wells Fargo is not entitled to summary

-22-

judgment as to the issue of liability until the issue of damages, if any, is resolved.  The amount of damages, if any, shall be determined once the Property is sold by the Receiver, and this case shall be stayed until that time.

CONCLUSION

For the reasons stated above,  Defendants' motion for summary judgment (Doc. 55) hereby is DENIED and Wells Fargo's motion for summary judgment (Doc. 54) hereby is DENIED.

**IT IS SO ORDERED**.

Dated:  August 30, 2013

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on August 30, 2013, by electronic and/or ordinary mail.

s/Barbara Radke
Deputy Clerk

---